We'll hear argument next in Case 13-1499, Williams-Yulee v. the Florida Bar. Mr. Pincus? Thank you, Mr. Chief Justice, and may it please the Court. Florida punished a candidate seeking election to judicial office because she signed form letters and a web posting soliciting contributions to her campaign committee, contributions that were completely lawful under Florida law. The First Amendment bars Florida from prohibiting that speech. The threshold question, of course, is what standard of review? We submit that strict scrutiny applies the standard that was applied by the Court below for several reasons. First of all, this is obviously a content-based restriction. It turns on the content of the speech. Does it solicit a campaign contribution? My friend relies on this Court's decision in McConnell to justify applying the closely drawn scrutiny standard that has sometimes been applied to campaign contribution limitations. That standard does not apply for several reasons. Mr. Pincus, whatever the standard, suppose the Florida rule was simply no face-to-face solicitations. That's it. Would you conceive that that would be a valid regulation, or would that fall under the First Amendment as well? Well, I certainly would concede it in this case, Your Honor, because my client didn't engage in any face-to-face solicitations. So that would eliminate the sanctions against her. Well, I want to understand your view of the scope of the First Amendment in relation to this election and the election of judges. I think a State could adopt a prophylactic rule prohibiting face-to-face solicitations, certainly one-on-one solicitation and perhaps, as some States have done, solicitations in larger groups. There might be some applications of that rule that were — that made that rule invalid as applied. For example, a face-to-face solicitation of one's relatives that have nothing to do with the judicial system and the State at issue. But I think the First Amendment would certainly allow the adoption of that sort of rule. But the First Amendment would not allow that for the candidate for political office. Exactly. So you are making a — you are recognizing that there's a difference between judicial office, that the First Amendment allows the State to do things with respect to the election of judges, that it wouldn't allow them to do with respect to the election of members of the legislature. Well, I guess I would amend my answer to say that the First Amendment might allow a ban on some solicitations on a coercion theory. Let me step back. There are three government interests that have been advanced in this case by the rule. No, but I just asked you. You gave me an answer, and now are you telling me that that answer was ill-considered? That is, a ban on face-to-face solicitation by candidates for judicial office, good or not? And it — would it be judged by the same standard as a ban on face-to-face solicitation by political? I think it would be judged by the same strict scrutiny standard, but I think the interests that the government could advance in support of that restriction in the judicial context, one of them doesn't exist in the legislative context, the interest in preventing bias or in preserving impartiality, and one, the interest in preventing coercion of the person solicited, I think, applies somewhat differently in the legislative context than it does in the judicial context. So I don't want to say that there's no ban on solicitation that would be permissible in the nonjudicial context. There is a Federal statute that bans Congress from soliciting — members of Congress from soliciting Federal employees, for example, that I can talk about. Kennedy, but if you had the statute that you say would be valid, barring face-to-face discrimination, then you have all sorts of gradations. What about a personal one-on-one letter? How is that different? I can just see the Court having to say, well, this is, I guess, underinclusive. And then if we say, well, the one-on-one letter, that's almost like a personal solicitation, we can ban that. Then what about a letter to five people? And then we're off to the races. It seems to me when you make the initial concession, you have a real problem in determining how to make this not over or underinclusive. I don't think so, Justice Kennedy. I think the Court in other contexts has certainly drawn a line between written communications and oral communications. In the lawyer solicitation context, for example, the Court has drawn that distinction. So I think there is a reasonable distinction that it says whatever the rule might be, written communications are fundamentally different if the interest that the government is asserting is coercion. And I'm going to say that if I, you know, we meet somewhere and I take out a tablet and write something down and hand it to you, is that written or oral? Well, I guess I would say in person, Your Honor. I think the question here, again, just to back up for a minute, is in, I think in all the context that we're talking about here, the interest is whether the person solicited is being coerced. And I think the interest is whether the person solicited is being coerced. Scalia. Back all the way up and give us the three interests that you started off saying were at issue here. You never did get to that, did you? I didn't. Sorry, Your Honor. There are three. Oh, it's your fault. There are three interests. One, the interest in preventing quid pro quo corruption. One, the interest in promoting impartiality slash preventing bias. And third, the interest in protecting persons solicited against coercion. What about the interest in judicial dignity? Well, and there's stuff we don't let judges do that we let other people do, such as it's at least a tradition. I'm not sure whether it's in any ethical rules, but let's assume it was in ethical rules that judges do not respond in op-ed pieces to criticisms of their decisions. All right? John Marshall did that, but he did it anonymously. Let's assume that that rule is written into judicial ethics. Would that stand? Well, I think there is such an interest. We acknowledge that in our brief. I'm not sure — I don't believe that it suffices to support the prohibition here for several reasons. First of all — No, no. But answer my question. Would that be okay? Would it be okay? An interest in judicial dignity. There are certain things that are infra-dignitatem, as we say. I think there is such an interest, and I think it's executed principally through the acts of judges as judges, and maybe is best analyzed under the government employee free speech rubric. So it doesn't necessarily have to reach a compelling interest in order for it to justify some restrictions on the judge's speech. I think in this context, to the extent that that interest doesn't apply for several reasons. First of all, we're talking about the campaign context, which is different. Second of all, to the extent that the interest would apply, here a fundamental principle of Florida's regulatory scheme is that judges may write thank-you notes for contributions. So they can say thank you, but they can't say thank you. Well, it's Florida law didn't let them do that. What I'm trying to find out is if you think you can have different rules for judicial elections than you can have for political elections. We're told by the Florida judges who filed a brief that they had a horrendous problem with corruption. And they wanted to get a handle on it. So they made this small step. And they ---- To answer your question, Justice Ginsburg, yes, there can be different rules. Because two of the interests that I mentioned, the interest in preventing impartiality and the interest in preventing coercion, apply differently in the judicial context. So I do think that in your hypothetical, could Florida prohibit in-person, one-to-one solicitations, or in-person solicitations to a group of some size, as States have done? Yes, I think they could do that, and I don't think that could be done for legislative or executive branch candidates. Ginsburg's view is we want our judiciary to be above the political fray. So we have this kind of restriction on putting themselves forward as a solicitor. Well, a couple of answers, Your Honor. I think the problem with a State having that interest is the State has adopted an election system that puts judges in the political fray. So as the Court said in its opinion in White, some things necessarily come with the choice to choose judges via election, and that includes the fact of an election and some First Amendment requirements that apply to election-related speech. So I think that's the problem with making that decision. A second problem is the particular scheme that Florida has adopted here, which, as I said, does allow the judge involvement in the contribution system. The judge can know who solicited, can know who gives, and can write thank you notes. So once Florida makes those decisions, the decision to prohibit the judge's involvement in the contribution system is not an option. Kennedy. Well, how can the judge not know, especially if some States want disclosure? Is the judge supposed to not read the disclosure list? Everybody else does? He doesn't? Well, there are some States that prohibit the judge from finding out who knows. Minnesota, for example, has that prohibition. It seems to me that that's just unworkable. I think there's a question about how effective it is, but I do think that undermines or underlies what's really going on here, that any incremental benefit that is served by a prohibition on solicitation, given the reality that the judge knows, and especially  So you're suggesting that there could be a mass mailing, but that the judge somehow could be prevented from knowing who responded. Well, that is the rule in some States. And I don't I'm asking you whether or not that is consistent with your theory of where we can draw the constitutional line. Well, I don't – I think the Court could conclude, as the Eighth Circuit did, that in Minnesota, a State like that, where the judge doesn't know, there's even less of a reason to prohibit solicitations, because the judge isn't going to know who responded. Can I go back? Good, honest, Midwestern State. They're not going to tell it. Can I go back to judicial dignity coercion? It's very, very, very rare that either by letter or by personal call that I ask a lawyer to do something, whether it's serve on a committee, help organize something, do whatever it is that I'm asking, that that lawyer will say no. Isn't it inherent in the lawyer-judge context that people are going to say yes? Well, two, I don't think so, Your Honor. In this solicitation, although Petitioner was a candidate, there was no response. Well, I But I think even for shootings It's unknown, but I'm talking about this prohibition is dealing with an issue that does happen in the vast majority of cases. I guess here's the contrast, Your Honor, if I may. I guess the question is what's the difference between that letter and the following letter that's signed by the members of the committee, which is totally permissible under Florida law? Dear Joe, as an attorney frequently appearing before the county court, we're sure you're concerned with the quality of the judiciary. Judge Jones personally asked us to serve on his campaign committee, and we're writing to ask you to contribute to his reelection. As you know, Florida law permits Judge Jones to thank contributors. I think once all those things are permissible, who makes the solicitation really doesn't make that much of an incremental difference in an area where we're talking about compelling interest. That's what you think. I can actually see how receiving a signed letter from the judge saying give or a telephone call or a personal meeting has an incrementally greater impact than a letter. I get, even today, I get a whole lot of campaign committee letters, and I just throw them out. If a candidate calls me or reaches out to me, I tell them I can't talk to them and I can't give. Okay? But I have a reason and an excuse. A lawyer doesn't have that reason or excuse. And I think that's why at least one line that I think is permissible in my response to Justice Ginsburg is a line between written communications and oral communications either one-to-one or in-person communications one-to-one in a small group. I think the coercive effect, to the extent there is one, is clearly greater there. And the question in the First Amendment context where we're talking about core critical speech, where the Court recognized both in the charitable contribution cases in Schaumburg and Riley, as well as in McConnell, that it is the intertwining of substantive messages and requests for contributions that make both effective, where you're severing that, there has to be a really good reason. And in the written communication context, at least, we submit, as Judge Sutton for the Sixth Circuit and as the Eleventh Circuit and as the Ninth Circuit have found, there isn't enough there. Alito, is there anything in the Florida rules, I couldn't find it, that would prohibit Judge Jones in your example from giving the committee a list of people to contact? There is a rule that says that judges can't or candidates can't do indirectly what they do directly, and I frankly don't know whether the Florida bar would interpret the giving of a list to circumvent that rule. Breyer, the problem is, in a way, to this side of this, and it's a sort of joke, but it's so true in the experience of the court of appeals that I had, my brother in the district court, district court judges I know, in State and Federal systems that the normal response to a lawyer, by a lawyer, to a judge in any minor request or, you know, something normal, the answer is yes. That's until they get out the door. I don't know what they say when they get out the door, but that is such a common experience, that when the judge says, can you please, yes, that's the answer. And you have to learn how to interpret when they really want to do no, and that's almost universal. And I thought that's why they're writing the rule the way they do. When it says, I ask for your support, an early contribution of 25, 50, 100, 250, or 500 made payable to me or the campaign will help, sincerely sign my name. That's a the answer to that question is yes. And if it's the campaign manager, perhaps it's no. I mean, I don't know how to go beyond that, and that's such instinctive and intuitive that I don't know. I'm asking it because I want it raised to the surface, and I want to see what there is to say. You can tell me just ignore it, but I want you to know it's there. Well, I think a couple of things, Your Honor. I think, first of all, there's not – I think you have to compare that letter to the text that I read, and it seems to me the fact that the candidate's or the judge's best friend is the chairman of his committee, it's a small community. Now, that's if you're maybe looking for something. When somebody else writes the letter, somebody else makes the request, this is so instinctive, but my instinct is it's not the same thing. But they're making the request on behalf of the judge. Right. I think that's the critical fact. And the judge can write a letter. It doesn't just go to a lawyer either. The limitation is not solicitation of lawyers, is it? It is. It's anybody, which really makes me think that it has more to do with judicial dignity than the corruption stuff we've been talking about. You can't solicit anybody. Absolutely, Your Honor, and I think that's one of the problems. Since the proof of the pudding in what Justice Breyer is saying in the statistics, one of the briefs mentioned that those candidates who can fundraise personally do appreciably better in collecting money than the candidates who have to go through a committee. So what would be the difference, other than the fact that there is some form of personal coercion in the presence of the judge asking for the money? I don't think so, Your Honor. I think the difference can — I mean, obviously, I don't know about where the statistics come from, but even assuming that the statistics are right, it seems to me in a system where we vote for a person, a message from that person that combines what they stand for with a request for a contribution makes that request for a contribution more effective, not because it's coercive, but because it's tied to what the person stands for. And those parts of the message are effective when they come from the person themselves. I think you'd find the same statistics true with respect to political candidates, that they do much better when they put the arm on you personally rather than having somebody else contact you. I can't imagine that would be any different. Well, that's the point, isn't it? Well, I think it's only the point to sit over — I'm sorry. I think it's only the point if that arises from coercion. And as I just said, I'm not sure that that's right. I think we don't know. We also don't know whether those statistics involve States that permit one-to-one in-person solicitation, which obviously is quite different from the sending of a letter. And in those States, and there are ten of them, obviously those — that is fully equivalent to the solicitation process in a legislative or executive race. So I think we don't quite know, but I think it would be drawing the wrong conclusion to say the only possible explanation is coercion. I think there are a number of other more likely explanations. Mr. Pincus, I take it it follows a fortiori from what you're saying, that the Federal Government's legal canon that applies to us is unconstitutional, at least as respects to written communications, so we're not allowed to put our name on fundraising materials and things like that. I take it you're saying that, too, that's got to go as well. Is that right? No, I don't think so, Your Honor. As I said in responding to Justice Scalia, I think the leeway that the Federal Government and the States have to regulate the judges and other employees because of inconsistency with their duties, this Court has said is much broader than it is and does not have to satisfy the compelling interest test, as this particular restriction does. So I don't think it at all follows. I'm sorry. I really didn't get that. Why does it not — why is the restriction on us constitutional, whereas — You are Federal employees. You're government employees. And so the Court has said in Pickering and other cases that the government, whoever the responsible rulemaking authority is, has much more authority to regulate the speech activities of Federal employees. So Florida could regulate the already elected judge when he's running for re-election. Well, I think he could say, we have a rule, judges don't solicit, period, for charities, for themselves, so we have a judge. He's a State employee. I take it from your answer in applying Pickering to government employee that the sitting judge can be restricted. No, I don't think so, Your Honor, because I think this is speech in a different category, any more than the government can say we're going to use Pickering to respect the solicitation speech of a sitting congressman or State legislature. I think it is the election context and the fact that the State has chosen to choose its judges via election that triggers the protections. But, you know, I would think it's just the opposite, right, that in a case for Federal judges, like you say, there's not really much of an interest. Who cares whether I solicit funds on behalf of my old law school? It doesn't have anything to do with what rulings I'm going to issue, who I'm going to favor, who I'm not going to favor. In this case, the State can really come in and say, you know, the things that we're objecting to, the solicitations that we're preventing are exactly the ones that are going to go to whether this judge can be an impartial judge rendering fair verdicts. I think that's wrong on two counts, Your Honor. I think there is, again, where the judge can know who contributed and can write a thank you note, the idea that prohibiting the judge to asking contributes in any way to the protection of that interest seems inconceivable if the question is, is there bias? What Florida has basically made a basic determination, that $1,000 campaign contribution limit is going to protect our interest against bias. And so the question then is, are any of these other activities going to create such an appearance? And where the State has said a thank you note, which seems more explicit. Kagan. Kagan. But, I mean, do you think it would be allowable for the State to say, no, even the Chairman can't make those solicitations? So you keep on falling back, well, they allow the Chairman or they allow the thank you notes. So now let's say, you know, the State says, look, we've been trying to do this because we've been trying to narrow the law in order to accommodate First Amendment interests. But if you're going to throw that back in our face, we'll apply it to the campaign chair, too. We'll apply it to thank you notes, too. Those will also be impermissible. Would that be constitutional? I think if the State wanted to adopt a system of public financing for judicial candidates, that it might well then be constitutional for the State to ban solicitations of an economy. Kennedy. But how about the answer to Justice Kagan's question? I don't think. You say, oh, well, I'm not going to answer that question because we can think about something else. I think the answer to that question is no, because the contributions are still permissible. And the line that the Court drew in McConnell in terms of solicitation limitations was it's quite permissible to ban candidates from soliciting contributions that cannot lawfully be made to their committees when there are other avenues, when they can still solicit contributions for their committees. I think it would be quite a different situation to say, yes, we're going to have an election, but no one can solicit any money for the campaign committee, because as the Court has said, money is essential to get the candidate's message out. But the whole effort on Florida's part is to make the selection of judges not like the political context. And what you're saying is that if they choose to elect their judges, they can do it only one way, and the same rules apply to the judges that apply to candidates for the State legislature. Well, respectfully, Your Honor, I don't think so. I think there are two distinctions. One is I do think once Florida says thank you notes are okay, it can't ban solicitations. It might have a better case to justify its State interest if it didn't do that. And I do think, as I said, the coercion rationale applies differently with respect to judges and would permit limitations that don't apply. If I may, Mr. Chief Justice, I'd like to reserve the balance of my time. Thank you, counsel. Mr. Richard. Mr. Chief Justice, and may it please the Court. I'd like to begin by responding to Justice Alito's question. The answer is that there's nothing in Florida law or in the canons that prohibits a candidate from giving names to the committee for the purpose of the committee's soliciting from those individuals. What the Florida canon is designed to do is something that this Court has recognized previously in Buckley and McConnell, which is to cut the direct link that creates the quid pro quo relationship by keeping the judge from communicating or the judicial candidate from communicating directly with the person that he or she desires to receive the solicitation. Well, it's just a thank you note. That's correct, Your Honor.  Saying you can say I'm a thank you note when what you've just said is not true. Well, if what we focus on, which is what my colleague and opposing counsel focused on, is the intimidation issue, I agree with you. Either the intimidation issue or the effort to curry to say you've curried favor, I agree with that. But there's another factor here that this Court has recognized is almost equally, if not equally, important, which is the appearance of the quid pro quo or the appearance of corrupt influence that is inherent in the quid pro quo that results in a public loss of confidence in the judicial system. Well, but there's not always such an appearance. What if a judge calls, you know, a college classmate? As you know, believe it or not, I'm a judge and I'm running for election. Could you give me some money? Direct input or direct solicitation, but nobody would say there's any real risk of corruption because he's calling up his old friends. Let's say he was not – they're not lawyers. I think, Your Honor, that what we deal with here in response to your question is similar in kind to this issue of how many people are being addressed. This Court has said that in circumstances like this, the Court has no scalpel, to use its words, as to where to draw the line. The question is what's judicially manageable. And so the question then becomes, where there's going to be a line drawing, is it unreasonable for the State to say, we're just going to prohibit it, we're not going to try to micromanage who it is? Now, there's a difference between micromanaging and over-inclusiveness or under-inclusiveness. I mean, this could be easily limited to litigants or lawyers appearing before the Court. It could be, Your Honor. But then the question is what the appearance to the public is. And the second question is, because it's always a question in First Amendment cases, how does this weigh against the imposition on the candidate's First Amendment rights? This Court has recognized, it did in both Buckley and McConnell, that one of the reasons that it upheld it and one of the reasons that it applied a lesser standard of review was because it said that the imposition on the communicative value of the contributions was marginal. In this case, it's even more marginal. Sotomayor, I'd be careful with that line, because there's a number of justices on the Court that dissented from that. And Citizens United has brought that into question. So assuming that's not the argument, what's the better response? No, I understand. I understand, Your Honor. Perhaps it was not the best way to lead into it. But my point here — Well, you only need five votes, and there were five votes. Don't be too intimidated. I'm getting to try to get your vote as well, Justice Scalia. I haven't reached that point yet. But — and I understand it's a high mountain to climb. But the point here that I'm trying to make is that this is an extremely minimal imposition on the candidate's freedom of expression, if there's any imposition at all. Could Florida apply this canon to candidates for political office? You're saying could it? Yes. If Florida says, we think it's such a good idea for the judges, we want to make it across the board, no candidate for political office can make a direct appeal for money. I think it would be far more difficult to convince the Court that that would be constitutional. And here's the reason. It's because of what Justice Kennedy has recognized as what he coined the good responsiveness and the bad responsiveness. In a democratic society, in a Republican form of government, candidates in the other two branches are expected to commit themselves in advance to certain positions and are expected to comply with that once they're elected in order to do what their supporters expected them to do when they supported them with financial contributions and otherwise. When we're talking about judges, there is no good responsiveness to a supporter or a contributor. Judges are expected to be impartial regardless of whether or not a person is a judge. Really, a judge can't campaign? You're saying I'm going to be tough on crime? That's a different issue, Your Honor. That's good responsiveness, I thought. Well, I think that's responsiveness to an issue, and I think the judges do have preconceived positions, but not responsive to an individual. That's the difference, and it's a big difference. Is there really a prospect of the appearance of partiality if you have a radio ad with the judge that says, you know, this is my philosophy, please send me a contribution? Is anybody going to think, oh, that judge is not going to be partial to one side or another? Well, I think that two things are occurring there. And the answer to your question is I don't, I can't presuppose who's going to think he's partial, who's going to think. I understand your point, Your Honor, and I think certainly you don't think that he's partial to a given individual at that stage. But that solicitation is a solicitation of a quid. We'll go back for a second to me, because I actually think judges should try to keep their preconceptions under control and decide the individual case. I think that is a widely shared perception, and I think that Florida has every right to say we want to further that. But what is your distinction between what I took as an important argument on the other side, and maybe you've said it already, but I want to hear it again. Florida lets judges write thank-you notes for contributions so there is direct contact, and the person who has given the money knows that the judge knows that he gave it, all right? What's the difference between that and this rule, which says that the judge cannot write to that individual in the first place asking for the money? I have several answers to that, Your Honor. The first one is just one would be enough, but I want to know what they are. But I want to use every weapon I have in my arsenal. So the first answer is that at the time that the money is being solicited, the contributor, if it's solicited through a third person, doesn't know whether the judge will ever find out. He can find out, but the person making the contribution doesn't know whether the judge will ever find out whether he's ever going to receive a thank-you note or not. He just doesn't know. Now, is it unlawful under Florida law to put in a letter written by the campaign manager, and I will tell the judge? To say what? I'm sorry. And I will tell the judge. It's not unlawful. All right. Very well. Then he might know. But there is a difference. All right. What's the second one? My second argument? No, no. I want to know what the differences are, which is the main point that was argued, that once you say they can write a thank-you note, and indeed, as you've added, in the initial letter, you can say, and I will tell the judge, once Florida permits those things, what is it that Florida's current 7c interpretation adds to that? And if it adds nothing of significance, why is it constitutional? That's their whole argument. Yes. I want to hear your responses. Yes, Your Honor. That's the under-inclusiveness argument. And my response is that the under-inclusiveness argument has never been applied by this Court to say that you want to refer. Now, I would prefer maybe there is no answer. Well, I think there is. One answer is to say it does exactly the same, it adds nothing, but you don't have to deal with every problem. I've got that answer. Do you have any answer that says it does add something? If so, what? I believe that Florida could prohibit the thank-you note as well, but it doesn't change the fact, by not prohibiting it does not undermine the fact that by telling judges that they cannot personally, face to face or by buttonhole or by telephone call, solicit it, that it does reduce significantly the public's impression of the fact that there is a quid pro quo. If you write a thank-you note, you are not a mendicant. You are not going around holding your hat out, asking people for money. But you're not relying on that, are you? You're not relying on the judicial dignity, the dignity of the office that is held or sought. That's – that has nothing to do with Florida's case. I'm not relying on that, Your Honor. I believe that if we're talking about expressive conduct, that it's unlikely that this Court would uphold it based upon the dignity of a given judge. It's possible that if the action rose to the point where it undermined the public's confidence in the judiciary as a whole, it might be sustained. But I agree with you that if all we're talking about is the dignity of a judge who is going around with a hat, I think that probably would not be sufficient for this Court to uphold it. Ginsburg, I'm going to say one more thing. Ginsburg, I'm going to say one more thing. The whole idea of the Florida Supreme Court, when they adopted this rule, is just that, that they wanted to put judges above the political fray. So they didn't want them to seek contributions, call it dignity, call it the integrity of the judiciary, call it the public shouldn't perceive of judges as being political officers. So we shouldn't say an election for a judge is the same thing as an election to the legislature. The whole idea is to put the judiciary in a separate category. I thought that was Florida's idea. Well, I think that's true, Your Honor. It's not only Florida's idea. I think it clearly reflects the culture of this nation, because virtually every State has adopted significantly higher standards of ethics for their judicial branch than for the other two branches. And I think that goes to Justice Kennedy's distinction between the good and the bad responsiveness, which is the same. Sotomayor, I think you answered Justice Breyer a little too quickly. If the letter ended with, I'm going to tell the judge you gave me money, then there might be a violation of that other code that doesn't permit a candidate to do, to try to circumvent the personal solicitation. Thank you, Your Honor. I agree with you. And number two, you had started, I think, in answering the question of the quid pro quo difference between a thank you and the initial ask. Yes. And of course, the one area where this Court has consistently recognized that the difference is in its effort to break the direct quid pro quo, the direct communication between the judge requesting the money, in this case a judge, as opposed to the other two branches, the Court has recognized that, but the judge requesting the money directly from the person who would be contributing. And when one envisions what does not exist in Florida and most States at the current time, which is a judge being able to pick up the telephone or visit any lawyer who ever appears before him, or for that matter, any non-lawyer who might end up appearing before him or before her, and ask for a contribution, and compare that to a third person saying to a voter or a contributor, my friend Joe Smith is running for judge and I would appreciate if you would give me money, I think it would be difficult for anyone who has lived in our society for any significant period of time to say that it is not a significant difference. And the public recognizes that. And the effect of it is the same. Alito We have before us a case involving a particular person. She did something and she was disciplined for it. So don't we have to compare what she did and the thing which is regarded by the Florida law as being unethical, and what she could have done, and see whether the incremental difference has any significant relationship to any interest that this rule is supposed to serve? Does it — was there a greater danger of quid pro quo corruption or the appearance of corruption or bias or coercion, the difference between what she did and what she could have done? And what she could have done, as I understand your answers, is the following. She could have — a letter could have been sent by a committee, and the letter could have said that Petitioner gave us your name and asked us to solicit a contribution from you, and that's what we're doing. And the letter could either say, and we'll let the judge know if you gave a contribution and — or the candidate know, and she can write you a thank-you note. She will write you a thank-you note if you contributed. Or you speak for the Florida Bar, so you said it would be okay to put that in the letter, but if that's not, at least you could put in a letter. And under Florida law, the candidate can see the list of people who contributed. So those are the two situations. Now, why was there any greater damage done by what she did as opposed to what you admit she could have done? Well, I would say the greater damage, again, goes to the fact that she is personally and publicly requesting a quid from people who can be expected to appear before her, and it is Florida's concern over the public's reaction to that, which I would suggest is a fair concern, and this Court has found in the other two branches, is a fair concern over the public's confidence in the judicial system. It's not just confidence in the judiciary, is it? I mean, to ask for a judge, to ask for a quid, puts pressure on people to give it. And that is a different evil than their simply knowing what happens, and I would say probably worse. To send a thank-you note is a form of politeness that creates knowledge, but does not, to the same degree, put pressure on the person to contribute. Now, is that fair or not fair? And don't just say yes because you think it's on your side, because I'll have plenty of people pointing out to me that it isn't necessarily a good argument if it isn't. Your Honor, I think it is clearly a good argument because it's difficult for me to give you another reason because you said it so eloquently, but I do believe that there is a significant difference between a judge requesting specifically a contribution or later saying thank you for the contribution. Now, when you add to it, what if the letter said the judge will know about this later? That murkies the water a bit, although there's no evidence that's ever been used. Ginsburg-Gilmour, Mr. Richard, there's something that the other side has said about your position, and I'd like your answer to it, that is that what you are advocating will help the people who are already in the judiciary, the people who have lots of money so they don't need contributions from others, the people who will be heard are like Ms. Ewley, who's trying for the first time. In other words, the Florida Bar has set up a system that works in favor of incumbents Yes, current officeholders and the rich. I disagree with that, Your Honor, and I find it curious that the Petitioner would suggest that if we take the restrictions off of incumbent judges so that they are now free to call lawyers who appear before them or litigants who might be appearing before them and ask for money, that that wouldn't give the incumbent an enormous advantage over non-incumbent judges. It seems to me that it would. But we're also dealing here in an area in which there is no evidence, either in the record or in the literature, to suggest that it makes any difference, and also that Well, I'm sorry, but up to this point you've been saying what a significant difference it makes whether someone can solicit in person or not, and that's why you've drawn the line there. And now you're telling us, well, it doesn't make much of a difference at all. No. It seems to me that it's self-evident, particularly in judicial races, that the prohibiting form of raising funds is to the great advantage of the incumbent, because the only way that in most judicial races the incumbents are going to be challenged if you have somebody who can get their own distinct message out. Well, I have two responses, Your Honor. And excuse me if I didn't clearly express myself in my response to Justice Ginsburg's question, but what I'm saying is, clearly, when you tell an incumbent judge that that judge can personally solicit money, that's going to give an incumbent judge who has far more intimidation power an advantage over a nonincumbent, and as to weighing which is going to give more or less advantage, it's difficult to answer that question. And generally, this Court doesn't find itself in the business of equalizing the playing field in any case. So I don't know that it makes any difference. But the other fact is that we have no evidence in this record or in the literature or in the case law to suggest that this is a factor under any circumstances. The other thing I'd like to comment, if I might go back to the question that Justice Alito asked me earlier, is I think that there is another linkage here that's important, which is this. If you look at the difference in the impact upon this Petitioner's free speech between sending a letter to one person or personally confronting one person and, on the other hand, sending it to 5 or 10 or 50 people, if it would even be manageable, to make a distinction, it doesn't move the free speech needle in this case one iota because there's very little impact on that candidate's free speech, no matter how many people the candidate is talking to. The candidate can still say anything he or she wants to about qualifications, about issues, about cases, about anything he or she wants to. This Court said so in White, and the Florida canon doesn't attempt to put any restriction on it. The only thing it says is you can't say to me, give me money. And this Court has recognized in Buckley and in McConnell that the only communicative value of saying, give me money, is that when you get money, it enables you to broadcast your message more widely. And the Court has said that that only rises to constitutional level when the restriction is so great that you can't broadcast your message reasonably. And we have no evidence, again, in the record, the literature, the case law, that it's the only test that you can have all sorts of campaign restrictions so long as they do not prevent, and we're going to sit in judgment about that, but it's the   reasonably. Now, what I refer to, Your Honor, is the discussion in Buckley and when it said that the restriction on campaign contributions on the amount of a contribution, that its communicative value was in the ability to be able to broadcast the message, and that it only became constitutionally significant if it was so draconian that the person could not raise enough money to reasonably be able to broadcast the message. Now, that's not the wording that the Court used, but that was the essence of what the Court said. My only point here is there's no nothing to suggest that Florida — that Canon 7C1's methodology is such that a candidate cannot raise enough money to be a viable candidate, and so what you're left with is no imposition appreciably on a candidate's expressive ability, and I think you fairly have to connect that to what Florida has done in the other hand is trying to avoid, which is this appearance of the — this quid pro quo and the appearance of corrupt influence, which is a significant — Scalia. All the First Amendment requires is not that you have unlimited capacity to speak, but that you — you be able to speak a reasonable amount. Is that — is that what the First Amendment demands? Well, I think that you be able to speak as much as you desire — As much as we think is reasonable, we, the judges. I think that that's more broadly stated than you, the judges, have said in the past. Broadly stated as you stated it, I think. No, I think it's as much as you desire to speak until you reach the level where you have — you have interfered with another substantial State interest. How substantial that has to be depends upon the standard of review that the Court applies. I still don't see how that's inconsistent with the rest of your argument. What you've been saying before is it's just a little bit that we prohibit, so don't worry about it. And — and I mean, the — the prohibition was limited to the important area. It's face-to-face that is important. And now you're saying it's no big deal because they can do all these other things. How do you reconcile those two positions? Well, I'm not saying that it's no big deal. I don't think we can ever say that when we're dealing with free speech. What I'm saying is that this Court historically has weighed the degree of imposition against the substantial interest that the State is attempting to serve. In this case, the State is serving an interest that this Court has recognized, at least in the area of the quid pro quo, that the State has not only a substantial interest— Where does it come from? Justice shall not be sold, nor shall it be denied. I mean, that's at least 800 years old. And if that defines the role of the judge, which I think it does, you're saying that it isn't. It is a — you do look to the degree to which you are interfering with the free speech, which is some degree, some, and it's not speech. It's really how you solicit money. And on the other side, how that interferes with that basic role of the judge. So then is it not relevant that the interference, even with raising money, which is at one degree from speech, is small? I believe it is relevant. I believe that this Court, in almost all of its major First Amendment cases, has asked that question. Well, 800 years ago, judges were not elected. I mean, you know, I appreciate the challenge you're under. You're kind of backing and filling. The fundamental choice was made by the State when they said we're going to have judges elected. And, I mean, you're kind of, as I say, trying to patch the problem there. But, I mean, you have a situation where the people in the State have said we're going to have judges elected, and we're going to recognize that you can contribute to judges because there are contribution limits. It seems to me you're under a great burden in trying to figure out how you're going to fix that without contravening the First Amendment. It is a great burden, Your Honor. Why is it a great burden? Does it change because you elect a judge? That you're changing the fundamental role of the judge? I don't mean that it's a great burden to make that point. What I mean is that we have an election of judges, which many people think is a burdensome system for selecting judges for a lot of reasons. But the fact is we have that. And Florida, under the United States Constitution, is entitled to have that. And what's more, in order to change the Florida Constitution, 60 percent of the people in Florida would have to vote to change it. And a substantial number of the voters in Florida have voted to change it unsuccessfully. And so what we're faced with is we're faced, as we said in the brief, with the reality that Florida is trying to weigh two fundamental constitutional interests and find a reasonable compromise. One is the interest in free speech. The other one is the undeniable interest, because it's essential to a stable democracy, of having a judiciary which avoids both the reality and the appearance of corrupt influence. If we looked at or somebody looked at the contributions to the candidates in an election for county court judge in Florida, what percentage of the contributions would be found to have come from practicing lawyers within the county who appear before that court? That's not on the record, Your Honor. However, studies have shown, I think, not only in the county court, but in all judicial elections, that the great, the large percentage of the contributions come from practicing lawyers. And I think that that's where judges naturally seek the contributions. Thank you, Your Honor. That could be either because lawyers expect judges to respond by favoring their cases, or it could be that lawyers care more about who the judges in the courts are. Isn't that quite natural? I think that's true, Your Honor. I'd be surprised if the statistics were any different. But it doesn't show any corruption, whatever. It just shows that lawyers want good judges and care more about it than the average citizen does. I think that's absolutely true, Your Honor. But I think that what we're concerned about is the two things that this Court has identified in the past, which is avoiding the potential for corruption that the Court has found is inherent in the quid pro quo relationship, and as importantly, avoiding the appearance of corruption that the public sees. And if I can address one more thing, Your Honor, because I am responding to your question, I understand that Your Honor does not believe that Buckley was decided correctly, and that they may come when Your Honor persuades this Court to recede from the parts that are applicable here. But in the meantime, I think that it is reasonable to urge the Court respectfully that the same rules that apply, or at least the minimum degree to which the Court has applied these rules to the other two branches, needs to be applied to the judicial branch, that there's certainly no basis, it would be totally inappropriate to carve out a right that judges have that the Court has not accorded to the other two branches, and that this case is an example of where that consistency is important. Thank you, Your Honor. Thank you, counsel. Mr. Pincus, you have four minutes left. Thank you, Mr. Chief Justice. I want to start out by pointing out, because I think it's important, that all of the examples that my colleague used about buttonholing people in the call and calling people one-on-one are one-to-one in-person or in-person over the phone solicitations, not the kind of written communications that are at issue in this case. And I think that's because it is very difficult to say that a written communication fits either of their two interests. And I think it's important to keep them separate. Justice, I mean, suppose I'm a judge and I say, dear Joe, you've been in my courtroom many times, and I hope I've always been fair, and I know you're going to be here some more times in the future, and I hope I always will be fair, and, you know, I'm running for judge, and I'd really like a contribution of $1,000. Signed, Judge Smith. And I think the issue, Your Honor, is the campaign committee under Florida law can write that exact same letter and can start by saying, Joe, as you know, I'm judge It can't say I. No, it can say I'm writing on behalf, I am one of the people who Judge Smith personally selected to solicit funds for his campaign, and then say the rest. And I think the difference in coercion there is really immeasurable and doesn't rise to the level of a compelling interest. I think it's important to make another point, which is my colleague said a reasonable And maybe if rational basis applied here, this would be a reasonable compromise. A rational basis, but I think until Citizens United in one opinion, which wasn't the majority in the more recent case, the Court had never used the word strict scrutiny in respect to campaign contributions, period. And I don't think it's used the word strict scrutiny either, ever, in respect to First Amendment limitations, in respect to what judges say. Am I right about that or wrong? I'm not positive. I think it did use strict scrutiny in White, Your Honor. And I think that was the case about what judges say. In White. But it also has used the strict scrutiny standard with respect to charitable solicitations. And I think it would be an odd state of affairs if charitable solicitations got less protection under the First Amendment than election-related solicitations, given that election stands at the core. Did you say that right? The other way. That charity? Yeah. Yes, that it should get more protection. I'm sorry. And just to go back to Justice Breyer, your question about coercion, I think it's important to separate coercion and quid pro quo because they get mixed up. Quid pro quo and preventing the appearance of quid pro quo corruption is an interest the Court has found compelling with respect to all elected officials. So I think if you accept my colleague's argument that preventing the appearance of quid pro quo corruption is sufficient to ban solicitation, then there's no reason why Florida couldn't say, such a great idea, we're going to apply it with respect to legislators. I think you the focus here, I think, really ends up being on coercion, not on the preventing of corruption. I'm sorry. Your opposite party did make the point that the legislative process presumes influence and presumes coercion, putting the arm on people to help you get into office, to maintain a position that you've promised you'd maintain. But that's not the focus of a judicial election. Well, I think corruption... I hope you don't want someone who keeps to a position merely because you gave money. That goes to a different question, Your Honor, I think, which is bias. And I think there's a difference between quid pro quo corruption, which is a quid pro quo deal, corrupt deal, and judges being unbiased. So I think my colleague refers to quid pro quo corruption because I think he wants to use the Court's analysis in McConnell, which I think is inapplicable anyway. But I don't think it's possible to say that quid pro quo corruption should be the basis here. Thank you, counsel. Counsel. The case is submitted.